607 A.2d 537

**Todd B. COLLIER**

v.

**MD–INDIVIDUAL PRACTICE ASSOCIATION, INC.**

**Misc. No. 29, Sept. Term, 1991.**

Court of Appeals of Maryland.

June 10, 1992.

John R. Dugan, Rockville, and David P. Sutton, Washington, D.C., both on brief, for appellant.

Christopher M. McMurray, Charles Lee Eisen, Susan La-Padula Buckingham, Kirkpatrick & Lockhart, all on brief, Washington, D.C., for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

This case comes to us from the United States Court of Appeals for the District of Columbia Circuit pursuant to the Maryland Uniform Certification of Questions of Law Act, Md.Code (1974, 1989 Repl.Vol.), §§ 12–601 through 12–609 of the Courts and Judicial Proceedings Article. The statement of relevant facts and the order of certification are reported in *Washington Hosp. Center Nat'l Rehabilitation Hosp. v. Collier*, 947 F.2d 1498 (D.C.Cir.1991). Two questions are certified. One concerns the construction of the definition of "eligible Dependents" in the group policy of health insurance involved here. The second question is whether an insured under a health policy may recover counsel fees if successful in pursuing a claim for breach of contract against the insurer based on a failure to pay promised benefits.

## I

The health insurer is MD–Individual Practice Association (MD–IPA). The claimant is Todd Collier (Collier), whose mother maintained a health insurance policy with MD–IPA.

Collier became nineteen years of age in May 1987. In September 1987, while playing touch football, he was injured and rendered quadriplegic.

The subject policy provides in relevant part that "eligible Dependents include:

. . .

- Dependent, unmarried children, including step-children, legally adopted children, as well as natural children who depend upon the Subscriber for support and qualify as dependents under applicable provisions of the Internal Revenue Code and who:
 - are under 19 years of age and maintain legal residence with Subscriber, or
 - are under 23 years of age and are full-time students at a recognized college, university or trade school."

At all relevant times Collier was a student at Montgomery College, living at home, and dependent upon his mother for financial support.

Collier's status as a "full-time student" is disputed. That term is not defined in the policy. The basic facts are these.

"Beginning with the spring semester of 1987, the College placed Collier on academic probation and allowed him to register for only six credits. In September 1987 Collier, mistakenly thinking that his probation had ended, tried to register for twelve or more credits for the fall semester. He was again allowed to register for only six credits, and hence was taking that number of credits when he was injured in September 1987."

*Collier*, 947 F.2d at 1500. The dispute arises because, "[a]t least for purposes of financial aid and academic honors, Montgomery College requires enrollment in twelve or more credits for a student to be classified 'full-time.'" *Id.* (Parentheses omitted).

The United States District Court for the District of Columbia granted summary judgment in favor of MD–IPA on Collier's claim against it, "holding that the term 'full-time student' is unambiguous." *Id.* at 1502. That Court "noted

that the term is 'frequently employed by colleges and universities,' and thought that 'the contractual expectations of the parties are fairly measured by reference to the definition provided by the applicable institution.'" *Id.* at 1502–03.

On appeal to the District of Columbia Circuit, Collier argued that "full-time student" is ambiguous and is not limited to the criteria used by the relevant school. Collier argued that the term means "any student in 'continuous attendance during the normal school year' or 'a person who regularly attends classes as his primary daily occupation.'" *Id.* at 1503.

Against that background the federal appellate court certified the following question to us:

"Does the term 'full-time student,' when used as a condition of coverage in a health insurance policy, unambiguously incorporate the criteria of the relevant educational institution?"

*Id.* The certifying court observed that if this Court answered the above-quoted question affirmatively, then the certifying court would affirm the grant of summary judgment, but if this Court "holds that 'full-time student' is ambiguous," then the certifying court asks us to proceed to the second question, involving fees.

 In Maryland insurance policies ordinarily are construed in the same manner as contracts generally. We do not follow the rule, adopted in some states, that insurance policies are to be construed most strongly against the insurer. *Cheney v. Bell Nat'l Life Ins. Co.*, 315 Md. 761, 766–67, 556 A.2d 1135, 1138 (1989). It is necessary to discern the intention of the parties. "To determine the intention of the parties ... we construe the instrument as a whole." *Pacific Indemnity Co. v. Interstate Fire & Casualty Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985). In so doing, we "examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Id.* Words are accorded their ordinary

and accepted meanings. "The test is what meaning a reasonably prudent layperson would attach to the term." *Id.* Thus, "[t]he language used may be ambiguous if it is 'general' and may suggest two meanings to a reasonably prudent layperson." *Id.* at 389, 556 A.2d at 489. If the language is ambiguous, extrinsic evidence may be consulted. "If the extrinsic evidence presents disputed factual issues, construction of the ambiguous contract is for the jury. The court may construe an ambiguous contract if there is no factual dispute in the evidence." *Id.* If, after considering extrinsic evidence, the ambiguity remains, it will ordinarily be resolved against the party who drafted the contract. *Mutual Fire, Marine & Inland Ins. Co. v. Vollmer,* 306 Md. 243, 251, 508 A.2d 130, 134 (1986). In cases involving insurance contracts of adhesion, that party is the insurer. We shall answer the first certified question in the light of these principles.

■ Although the insurer was free, within the limits of public policy, to provide a special definition of "full-time student" in the insurance contract, *see Valliere v. Allstate Ins. Co.,* 324 Md. 139, 596 A.2d 636 (1991), the insurer did not do so. Absent such a definition, the certified question obviously is not limited to whether there has been an express incorporation by reference of the criteria of the relevant educational institution. Rather, the question may be interpreted as asking whether, for this type of contract, there is a rule of Maryland law which incorporates the relevant school's criteria, so that there would be no ambiguity. There is no such rule of Maryland law.

■ In the absence of a controlling legal definition, under Maryland law as reviewed above, the question becomes, "What is the customary and normal meaning of 'full-time student' in the context of a group health insurance policy?" One factor in determining the ordinary and accepted meaning of a contract term is the purpose of the contract. The court in *Society of the New York Hosp. v. Malsky,* 86 Misc.2d 221, 382 N.Y.S.2d 433, *aff'd,* 88 Misc.2d 832, 390

N.Y.S.2d 512 (1976) (per curiam), well expressed the purpose of the subject type of contract provision when it said:

> "By restricting coverage to those students who attend school full time, who are financially dependent on the [subscriber], who have the same residence as the [subscriber] and who are unmarried, it is evident that the purpose is to provide coverage for the student who would not be expected to have access to group health insurance coverage of his own. The medical expenses of such a student normally can be expected to be an obligation of the [subscriber]."

382 N.Y.S.2d at 437.

■ Further, applying the reasonable person standard to determine normal meaning in the context dictates against a construction that would have otherwise eligible dependents moving in or out of a covered person status because of fluctuations from time to time in course scheduling.

Absent an express definition, and in light of the foregoing, "full-time student" is ambiguous, in that it suggests two or more meanings to reasonable laypersons. The term may connote the minimum requirements of the institution for recognition for honors, or for student aid grants, or, at a public institution, for use in an aid-to-education formula of state or local government. But, a subscriber's dependent children of college age may fall below some minimum criterion because of temporary health problems or because of academic difficulties. A student may be carrying the maximum number of credit hours that the institution permits the particular student to carry, or that the student's physician permits the student to carry during a period of recuperation. Because of the demands of extracurricular school activities, such as athletics, or dramatics, or work on a daily school newspaper, a student may decide to carry a lighter course load during the fall and spring semesters, but make up the difference, in relation to the institution's criteria, by taking summer courses. Depending on all of the circumstances in an actual case, lay persons could reasonably conclude that students whose claims fall within

the framework of these hypotheticals are full time because their "primary daily occupation was that of student." *Massey v. Board of Trustees, State Employees Group Benefits Program,* 500 So.2d 864, 866 (La.App.1986), *cert. denied,* 501 So.2d 775 (La.1987).

The insurer in *Massey* made the very argument submitted by MD–IPA here. The student in *Massey* was carrying nine credit hours at the relevant time, whereas the educational institution considered one enrolled in less than twelve hours per semester to be a part-time student. During the semester when accidental injury occurred the student did not meet the university's full-time criterion because a professor had recommended that the student take three less hours. Under those circumstances the court held "full-time student" to be ambiguous, applying either to the criteria of the school or "to the actual practice of the student involved." *Id.* at 866.

The insurer here points to no case, and our research has not disclosed any case, in which a court has incorporated a school criterion into the policy term, "full-time student," to the exclusion of any other construction. Cases in which courts have applied "full-time student" in a ruling of law do so in relation to the specific facts presented. These are factual scenarios so far removed from any ordinary and accepted meaning of "full-time student" that nuances, such as that between a twelve credit workload and a six credit academic probation, become legally immaterial.

■ Dependent children cannot be full-time students if they have withdrawn from the institution, are not attending classes, have not taken examinations, and are not enrolled for upcoming classes, even if there is evidence of an intent to re-enroll. *See Bancale v. R.C.A. Serv. Co.,* No. 10051, 1987 WL 6240 (Ohio App. Feb. 3, 1987) (LEXIS, Ohio library, Cases file); *Colonial Life Ins. Co. v. Hazelton,* 711 S.W.2d 305 (Tex.App.1986); *Hoffman v. Prudential Ins. Co.,* 624 S.W.2d 626 (Tex.App.1981).

*Blue Cross & Blue Shield v. Cassady,* 496 So.2d 875 (Fla.App.1986), is similar. The dependent, after dropping out of high school, had obtained an equivalency diploma at the end of January 1984 when it was too late to enroll in junior college. Although the dependent had planned to enroll for the summer semester, he had not done so by March when he suffered accidental injuries. *Cassady* concluded that the policy provision was not ambiguous. 496 So.2d at 877. The court said that

> " 'full-time student' ... must be given its usual interpretation. Such term envisions a person's enrollment in an academic institution and attendance at classes on a substantial basis. Full-time ordinarily signifies the normal or standard period of time spent in a named activity."

*Id.* (quoting *Margie Bridals, Inc. v. Mutual Benefit Life Ins. Co.,* 62 Ill.App.3d 542, 19 Ill.Dec. 547, 550, 379 N.E.2d 62, 65 (1978)). The Florida court principally relied on the lack of any enrollment, and not school criteria, for its conclusion that there was no ambiguity.

*Margie Bridals,* quoted by the Florida court, presents the problem in a somewhat different, but factually clear-cut, context. The dependent had officially withdrawn from classes and obtained a leave of absence from a university in mid-October 1974, because of anorexia nervosa. An extended benefit provision in the policy continued coverage for medical expenses through the end of December 1975. It was contended that benefits continued thereafter, because the dependent, while on leave of absence, was a full-time student. The court rejected an attempted distinction between active and inactive full-time students. Any minimum credit requirement for full-time student status of the university involved in *Margie Bridals* is not even mentioned in the opinion.

Another decision involving an extended disability is *Klein v. Empire Blue Cross & Blue Shield,* 173 A.D.2d 1006, 569 N.Y.S.2d 838, *app. denied,* 78 N.Y.2d 863, 578 N.Y.S.2d 878, 586 N.E.2d 61 (1991). The dependent was permanently and totally disabled in January 1985. He registered for the fall

1985 semester at college, taking one course as a homebound student, and he continued so to take one course per semester thereafter. Benefits were paid through December 1986 when the policy of a new insurer replaced the earlier plan. The issue controlling coverage under the new plan was whether the dependent was a full-time student on January 1, 1987. The insurer produced the relevant college catalogue which referred to full-time students as those registered for twelve or more credits. The court, however, said that "where, as here, tendered extrinsic evidence is conclusory and cannot resolve the *equivocality* of the language of the contract, the issue remains a question of law for the court." 569 N.Y.S.2d at 842 (emphasis added). The court found it unnecessary to define precisely the meaning of "full-time student," because it held that registration for one course was legally insufficient.

*See also Swint v. Protective Life Ins. Co.,* 779 F.Supp. 532, 538 n. 6 (S.D.Ala.1991) (dicta that "full-time student" in employee benefit health plan is ambiguous).

The ambiguity on the face of the contract permits resort to extrinsic evidence to attempt to resolve the ambiguity. That extrinsic evidence reveals the twelve credit criterion used for some purposes at Montgomery College. Under the cases reviewed above that extrinsic evidence is not conclusive as a matter of law and does not resolve the ambiguity. The extrinsic evidence merely confirms that the competing reasonable constructions lead to different results.

Our answer to the first certified question is "No."

II

Two hospitals sued Collier in the United States District Court, seeking payment for his treatment. Collier answered and also impleaded MD–IPA as a third-party defendant. Judgment was entered in favor of the hospitals against Collier. While Collier's appeal from the summary judgment in favor of MD–IPA was pending, the insurer settled with

the hospitals, thereby fully satisfying the judgments against Collier.

█ In the United States Court of Appeals, MD–IPA argued that Collier's appeal was moot because of the settlement. Collier, however, claimed "his attorneys' fees as an element of damages stemming from MD–IPA's alleged breach of the contract now in suit." *Collier*, 947 F.2d at 1502. The court agreed that the case would not be moot, if such a claim were cognizable under Maryland law. Therefore a second question was certified to us, to be answered only if we gave a negative answer to the first certified question. The second question is:

> "Under Maryland law, may an insured covered by a health insurance policy recover, as an element of contract damages, the attorneys' fees he reasonably incurs in order to compel coverage, where the policy does not expressly provide for such recovery and the insurer denied coverage in good faith?"

Our answer to the precise question certified is "No."

In Maryland, "[t]he general rule is that costs and expenses of litigation, other than the usual and ordinary Court costs, are not recoverable in an action for damages." *McGaw v. Acker, Merrall & Condit Co.*, 111 Md. 153, 160, 73 A. 731, 734 (1909). "[B]ut where the wrongful acts of the defendant ha[ve] involved the plaintiff in litigation with others, or placed him in such relations with others as make it necessary to incur expense to protect his interest, such costs and expense should be treated as the legal consequences of the original wrongful act." *Id.* This latter rule, applicable to collateral litigation, is not embraced in the certified question.[1] Nor is there any contractual, statutory

---

1. To the extent that Collier incurred counsel fee expense for the defense of the claims of the hospitals against him, those expenses arguably fall within the rule applicable to collateral litigation with third parties. *See Estate of Coppersmith v. Blue Cross & Blue Shield*, 177 A.D.2d 373, 576 N.Y.S.2d 126 (1991). This Court has also recognized that counsel fees incurred in the defense of claims may be

or rule provision on which Collier founds his claim to counsel fees.

Rather, Collier seeks to extend the Maryland law concerning counsel fees in actions between insureds and liability insurers. We have held that counsel fees may be recovered by an insured who succeeds in obtaining a declaratory judgment that a liability policy provides coverage for the occurrence, where the action has been brought either by the liability insurer, *Bankers & Shippers Ins. Co. v. Electro Enterprises*, 287 Md. 641, 415 A.2d 278 (1980), or by the insured, *Government Employees Ins. Co. v. Taylor*, 270 Md. 11, 310 A.2d 49 (1973). The declaratory judgment cases have involved liability policies containing a covenant by the insurer to defend against claims, in addition to a covenant to satisfy, up to policy limits, amounts for which the insured may be liable for covered acts or omissions. We have also permitted the recovery of counsel fees incurred by an insured in an action brought against a liability insurer for breach of a contractual promise to pay up to a specified amount for the insured's liability and defense combined, without the insurer itself providing the defense. *See Continental Casualty Co. v. Board of Educ.*, 302 Md. 516, 489 A.2d 536 (1985).

Collier submits that the recovery of fees in these cases for the services of counsel in defending or prosecuting the action by or against the insurer is simply the award of consequential damages to compensate for a foreseeable expense arising from breach of the insurer's promise to defend or to pay for the cost of defense. Just as liability insurers must pay counsel fees incurred in declaratory judgment litigation or breach of contract suits against them, as consequential damages for breach of contract, so, Collier argues, must MD–IPA pay those expenses in the

---

apportioned between covered and uncovered claims under a directors' and officers' liability policy. *Continental Casualty Co. v. Board of Educ.*, 302 Md. 516, 489 A.2d 536 (1985). The certified question, however, directs us to consider only possible contract damages measured by fees incurred "to compel coverage."

action against it. MD–IPA counters by arguing that the rule for which Collier contends does not apply to it. MD–IPA says that the Maryland cases relied on by Collier involved third-party liability coverage, whereas MD–IPA is a health insurer, writing first-party coverage. In rebuttal, Collier equates a health insurer's promise to pay benefits directly to third parties, *i.e.*, nonparticipating health care providers, with a liability insurer's promise to pay third parties to whom the insured is liable.

These contentions lay bare the underlying conflict between the principle that breach of contract damages will be awarded to protect the promisee's expectation interest and the principle, known as the American rule, that costs awarded to a prevailing party ordinarily do not include the counsel fees of the prevailing party.

Where a liability insurer has promised to defend the insured against a covered claim and fails to do so, where a health insurer has promised to pay certain benefits for the insured to a third-party provider and fails to do so, and, indeed, where any promisor breaches the contract and causes loss to the promisee, expense incurred by the promisee in engaging counsel to press the breach of contract claim "may fairly and reasonably be considered [as] arising naturally, *i.e.*, according to the usual course of things, from such breach of contract itself." *Hadley v. Baxendale*, 9 Ex. 341, 354, 156 Eng.Rep. 145, 151 (1854).

The American rule stands as a barrier to the recovery, as consequential damages, of foreseeable counsel fees incurred in enforcing remedies for the breach. The rule has been part of the jurisprudence of this country for nearly 200 years.

"During the late colonial period, legislation provided for fee recovery as an aspect of comprehensive attorney fee regulation. But this regulatory scheme did not long survive the Revolution. During the first half of the nineteenth century, lawyers freed themselves from fee regulation and gained the right to charge clients what the market would bear. As a result, the right to recover

attorney fees from an opposing party became an unimportant vestige. This triumph of fee contracts between lawyer and client as the financial basis of litigation prepared the way for legislators and judges to proclaim the principle that one party should not be liable for an opponent's legal expenses."

Leubsdorf, *Toward A History of the American Rule on Attorney Fee Recovery,* 47 Law & Contemp.Probs. 9, 9 (1984).

Within the foregoing framework, the Maryland rule, permitting the recovery of the insured's counsel fees in a declaratory judgment action with the liability insurer is an anomaly. Where the breach is of the promise to defend or to pay the cost of defense, counsel fees incurred in litigation with the third party are damages flowing from that breach, but that does not explain why the American rule is not applied to the claim by the insured against the liability insurer to obtain a declaration of, or damages for, that breach. We have said that "[t]he legal theory supporting this rule remains unrefined." *Continental Casualty Co.,* 302 Md. at 537, 489 A.2d at 547.

Permitting recovery of counsel fees of the insured in declaratory judgment litigation with the insurer came into Maryland law in *Cohen v. American Home Assurance Co.,* 255 Md. 334, 258 A.2d 225 (1969). Two theories—authorized expenditure and contract damages—were suggested as underlying the rule, without selecting either. *Id.* at 363, 258 A.2d at 239. The authorized expenditure theory was derived from cases, illustrated by *Standard Accident Ins. Co. v. Hull,* 91 F.Supp. 65 (S.D.Cal.1950), involving policies in which the insurer promised to reimburse the insured for expenses incurred at the insurer's request. Naming the insured as defendant in a declaratory judgment action was held to be a request within that covenant. This theory is not involved in the case before us.

The contract damages theory of *Cohen* is presented with approval in Appleman, 7C *Insurance Law and Practice* § 4691, at 283 (1979), where the author states:

"[T]he insured has a contract right to have actions against him defended by the insurer, at its expense. If the insurer can force him into a declaratory judgment proceeding, and, even though it loses in such action, compel him to bear the expense of such litigation, the insured is actually no better off financially than if he had never had the contract right mentioned above."

This rationale, in essence, endorses benefit of the bargain damages without restriction by the American rule. That philosophy plainly appears in cases which have made the sort of extension Collier seeks here. Collier cites *Hayseeds, Inc. v. State Farm Fire & Casualty Co.*, 352 S.E.2d 73 (W.Va.1986), where the court permitted the insured under a policy of property insurance to recover counsel fees expended by the insured to recover for a fire loss. The court said:

"[W]e consider it of little importance whether an insurer contests an insured's claim in good or bad faith. In either case, the insured is out his consequential damages and attorney's fees. To impose upon the insured the cost of compelling his insurer to honor its contractual obligation is effectively to deny him the benefit of his bargain."

*Id.* at 79–80.[2]

In *Olympic Steamship Co. v. Centennial Ins. Co.*, 117 Wash.2d 37, 811 P.2d 673 (1991), a comprehensive liability insurer disclaimed coverage on a claim against its insured, a salmon packer, for loss sustained by the packer's customers due to defective packing. The court held "that an award of fees is required in any legal action where the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract, regardless

---

**2.** The *Hayseeds* rule continues to operate in West Virginia. *See Smithson v. United States Fidelity & Guar. Co.*, 186 W.Va. 195, 411 S.E.2d 850 (1991) (fire loss on personal property); *Jordan v. National Grange Mut. Ins. Co.*, 183 W.Va. 9, 393 S.E.2d 647 (1990) (fire loss on a building and contents); *Thomas v. State Farm Mut. Auto. Ins. Co.*, 181 W.Va. 604, 383 S.E.2d 786 (1989) (collision damage to insured's automobile).

of whether the insurer's duty to defend is at issue." 811 P.2d at 681. A court in another case, concluding that "[a]n award of attorney fees merely restores plaintiff to the position she would have occupied had the company honored its contract of insurance in the first instance," awarded counsel fees to the insured under a title policy for failure of the insurer to cure title. *Hedgecock v. Stewart Title Guar. Co.*, 676 P.2d 1208, 1211 (Colo.App.1983), *cert. denied, id.* (1984).

*Hedgecock* was cited to a different division of the Colorado Court of Appeals in *Rhodes v. Copic Ins. Co.*, 819 P.2d 1060 (Colo.App.1991). The *Rhodes* court reaffirmed the American rule and said that "insofar as the . . . *Hedgecock* decision[] may deviate from the established controlling precedent . . . we decline to extend [it] to the circumstances presented in this proceeding for declaratory relief." *Id.* at 1062. The proceeding was one in which the insured under a liability policy obtained a judgment declaring coverage applied.

One commentator, Allan D. Windt, *Insurance Claims and Disputes* § 8.14 (2d ed. 1988), after reviewing the counsel fee cases involving declaratory judgment actions with liability insurers, concludes:

> "The courts adhering to the foregoing special rules, however, have failed, in the few cases in which they have tried, to provide any persuasive justification for those rules. It has been suggested, for example, that the insured should be entitled to recover the attorney's fees incurred in a declaratory judgment action because the expense of such an action arose as a direct consequence of the insurer's breach of contract. That analysis, however, proves too much, since it would also justify an attorney's fees award whenever the insured successfully brings suit against the insurer for damages."

*Id.* at 438 (footnote omitted).

From the standpoint of a strict application of the American rule, there is no logical reason why the successful

plaintiff's action on a liability insurance policy for breach of a promise to defend, or to pay the cost of defense, should include counsel fees in prosecuting the breach of contract action, when successful plaintiffs' actions for other breaches of insurance contracts, or for breaches of other contracts, do not ordinarily include those counsel fees. The Maryland rule awarding to the successful insured counsel fees in declaratory judgment or assumpsit actions with liability insurers for breach of the promise to defend or to pay the cost of defense is an exception to the American rule. To extend that exception to health insurers, who breach their contracts by failure to pay covered benefits, will only compound the anomaly. It would probably mark the elimination of the American rule as to contract actions against insurers generally and leave in doubt the efficacy of the American rule as to other types of contracts.

 With the exception of cases involving liability insurers and cost of defense, Maryland law has never recognized fee shifting in breach of contract actions, absent contractual provision, statute or rule. We leave that law as we find it. For these reasons the second certified question has been answered, "No."

CERTIFIED QUESTIONS ANSWERED AS ABOVE SET FORTH. COSTS TO BE EQUALLY DIVIDED BETWEEN THE PARTIES.